UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT CRUZ, for Debra Cruz (deceased), | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 3:19-cv-1085 JD ) ) |
| ANDREW M. SAUL, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Debra Cruz, now deceased, applied for social security disability benefits, alleging that she was unable to work from April 17, 2016 until her death on October 24, 2019. Ms. Cruz alleged that she suffered from a number of physical and mental conditions that impaired her ability to work. Following a hearing before an administrative law judge, the ALJ entered an unfavorable decision on December 5, 2018. (R. 20). The ALJ found that while Ms. Cruz could no longer perform her past work as a custodian, she could work as a dishwasher, laundry worker, or hand packager. (R. 19). Therefore, her claim for disability benefits was denied. Mr. Cruz, on behalf of his wife who passed away in October of 2019, now appeals that finding. As explained below, the Court remands this matter to the Commissioner, as the ALJ failed to create an accurate and logical bridge to support her residual functional capacity finding in light of Ms. Cruz's mental limitations.

### I.     FACTUAL BACKGROUND

Prior to the onset of her disability, Ms. Cruz worked as a custodian for the City of Mishawaka School System for 20 years. Ms. Cruz stated that she had several mental conditions

1

which prevented her from working: bipolar disorder, schizophrenia, delusional disorder, and depression. (R. 220). At the hearing before the ALJ, Ms. Cruz testified that she was unable to work following her knee surgery because she was unable to function like she used to. She explained, "I can't emotionally, emotionally do my job." (R. 64). During the same hearing, Ms. Cruz's attorney amended her alleged onset date from September 3, 2016 to April 17, 2017, which was more consistent with her first hospitalization due to a dissociated event she experienced when she was deemed a suicide risk. (R. 51, 340). She was admitted into an inpatient psychiatric center at Memorial Epworth where she was diagnosed with major depressive disorder that was severe with psychotic features. (R. 373). Ms. Cruz was not discharged from the center until over a week later. (R. 384). Ms. Cruz was readmitted to the center two weeks later after she got lost in the middle of the night following a visit to her father in Michigan. (R. 395). The notes from that visit indicated that she "does not understand her limitations, she is blaming the medication for her delays or confusion" and that she "has a poor understanding of her current mental illness" and finally that she "denied depression and anxiety." (R. 396).

As her mental health continued to fluctuate, Ms. Cruz developed new physical impairments. She fell down the stairs, injuring her knee in August of 2016. (R. at 591, 633). Ms. Cruz continued to have pain associated with her knee injury and stated that she struggled working and putting full weight on that knee. (R. at 694). In October of 2016, Ms. Cruz was diagnosed with a sprain to her right knee muscle, slight fraying of the back edge of the meniscus, a mild irregularity of the kneecap cartilage, and fluid around the knee joint. (R. at 962). Her pain with that injury continued, resulting in a limited range of motion in that knee with swelling and pain at the extreme limits of range. (R. at 633). After non-operative treatments failed to mitigate

her pain, she underwent a diagnostic arthroscopy to determine the accuracy of the diagnosis of her knee injury as well as a meniscectomy to remove the damaged portion of her meniscus and a chondroplasty to remove the damaged cartilage. (R. 630). Ms. Cruz testified at the hearing before the ALJ that her knee surgery played a part in her absence from work. (R. 63). Post-surgery, "an irregular stride" was noted during a neurological exam in late 2016. (R. 663). At that point, her gait was also noted to be normal but with a slight limp. (R. 658). However, by August 2017, she would again be diagnosed with crepitus (creaky joints), a tear in the meniscus, and pain at extreme limits of range motion. (R. 677). At the time of filing her disability application, Ms. Cruz stated that she was prescribed and using a cane. (R. 245, 254).

In September of 2016, Ms. Cruz was interviewed by the Social Security Administration and the interviewer stated in the Disability Report that she "was able to answer most questions at first, then, she became very agitated and delusional for unknown reasons. She wasn't making sense. She became angry at her husband and stopped talking." (R. 230). Her husband completed an Adult Function Report for Ms. Cruz and explained that before her illness, she was able to do everything (R. 249), but now she was unable to do house or yard work because it creates anxiety and frustration for her (R. 251). He explained that she could no longer handle their finances and has problems getting along with family, friends, and neighbors because "she gets paranoid and feels people are out to get her" and that she "gets severe anxiety whenever in big crowds." (R. 253). Finally, Mr. Cruz indicated that Ms. Cruz's mental condition and anxiety prevented her from taking part in a long list of activities including walking, sitting, talking, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. *Id*.

At the hearing held on August 22, 2018, Ms. Cruz confirmed many of these statements made by her husband. She stated that she never leaves the house unless her husband forces her to leave. (R. 54). She also explained that she does not drive anymore due to the side effects of her medication and that she feels uncomfortable when she goes to the Oaklawn Psychiatric Center for counseling because she is paranoid about running into people from her past. (R. 69). She testified that her husband now does everything including grocery shopping and cleaning the house. (R. 77). Mr. Cruz also testified explaining that his wife was no longer herself, her moods changed minute-to-minute and that she talked to herself in the garage. (R. 82). He also testified that he did not think she was honest with her doctors about her psychological state because she was afraid of being put into a facility. (R. 93).

During the hearing, the VE testified based strictly on the hypotheticals posed to him. The first hypothetical asked whether a person working at a medium exertional level could perform Ms. Cruz's past work as a janitor; the answer was yes. (R. at 95–96). The second hypothetical contained no exertional limits, but the person was limited to work with simple, routine tasks and occasional interaction with the public. (R. 96). The VE stated the hypothetical person would not be able to perform janitorial work but instead provided three alternative jobs: dishwasher, laundry worker, or hand packager. *Id.* The third hypothetical also contained no exertional limits but limited the person to simple and routine tasks where the work was free of assembly-line-type work and was defined as low stress with only brief interaction with the public and other employees. (R. 97). This hypothetical resulted in the alternative jobs of dishwasher, laundry worker, and machine feeder. *Id.*

After hearing testimony from Mr. and Mrs. Cruz in addition to the VE, the ALJ made the following residual functional capacity finding:

4

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to work that consists of simple, routine tasks. The claimant can have occasional interaction with the public.

(R. 15). The ALJ issued a decision on December 5, 2018 finding that Ms. Cruz had the following severe impairments: bipolar disorder, major depressive disorder, and anxiety disorder. (R. 12). The ALJ ultimately denied Ms. Cruz disability benefits concluding that she was not disabled under the Social Security Act because she was able to perform other work in the economy. On September 18, 2019, the Appeals Council denied Ms. Cruz's request for review which made the ALJ's decision the final determination of the Commissioner.

## II. STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the ALJ's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's

5

own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. While the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III. STANDARD FOR DISABILITY

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, then in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545. The ALJ then uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## IV. DISCUSSION

Mr. Cruz, on behalf of his wife, argues that the ALJ's opinion contains two critical defects which render the decision unsupported. First, the ALJ's decision is based on cherry-picked evidence that highlights normal findings and emphasizes evidence of normal functioning while overlooking objective abnormalities or difficulties in functioning. Second, the ALJ's decision failed to provide an accurate and logical bridge between the evidence and her conclusions. When considering Ms. Cruz's mental limitations most notably in reference to her ability to interact with others, this Court agrees and remands for the following reasons.

An ALJ must account for all limitations in the determination of the RFC. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014). This requires that the ALJ consider all evidence on the record to adequately assess what may affect the RFC analysis. *Golembiewski*, 322 F.3d at 917. Failing to consider the fluctuations of stability that accompany mental health issues and

only accounting for the improvements made fails to evaluate *all* the limitations associated with mental health conditions. *Phillips v. Astrue*, 413 Fed. Appx. 878, 886 (7th Cir. 2010) (emphasis added). When considering the daily activities in which a claimant engages to determine their ability to perform work in the national economy, the ALJ may not consider daily activities without acknowledging the limitations inherent in their execution. *See, e.g.*, *Childress v. Colvin*, 845 F.3d 789, 792–93 (7th Cir. 2017). "[F]ailing to recognize the difference between performing activities of daily living with flexibility (and often with help from family and friends) and performing to the standards required by an employer 'is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'" *Id.* at 793 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, the ALJ failed to consider the appropriate limitations created by Ms. Cruz's mental impairments and failed to create an adequate and logical bridge from the evidence of her severe mental impairments to her functional capacity. Ms. Cruz's bipolar disorder, major depressive disorder, and anxiety disorders were all deemed severe impairments by the ALJ. (R. 12). The ALJ also determined that Ms. Cruz had moderate limitations in her abilities to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace. (R. 14). A mild limitation was found in her ability to manage herself. (R. 15). When considering Ms. Cruz's ability to interact with others, the ALJ over-emphasized her responses in both Function Reports (Ex. 5E, 10E) instead of crediting other information in the record which tended to indicate more severe limitations. The ALJ found Ms. Cruz's GAF scores "to be inconsistent with the record" even though they were administered when she was suffering from episodes of psychosis. (R. 14). As Ms. Cruz argues in her brief, the ALJ also failed to address evidence of her anxiety and paranoia, which would directly affect her ability to interact with others in a

workplace. (R. 242-33, 244, 253-54, 276, 289, 290). She asserts that "the ALJ's RFC limiting [Ms. Cruz] to 'simple, routine tasks' and 'occasional interaction with the public,' fails to fully account for [Ms. Cruz's] mental limitations." [DE 12 at 20]. Ms. Cruz cites to several cases where the Seventh Circuit has "repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). "More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

  This Court agrees that the ALJ's RFC is insufficient and ignores evidence that would warrant additional mental limitations. Not only was she admitted to the hospital on two occasions for suicidal tendencies and psychotic episodes (Ex. 2F, 4F, 12F), but she regularly shared with her doctors that she was depressed and anxious. When considering the evidence in the record, the ALJ cited to the Function Reports to demonstrate that Ms. Cruz's claims were not entirely consistent with the medical record. (R. 17). The ALJ stated that "she went out to dinner, visited family members, and to the store," but the Function Report (Ex. 5E) also included Ms. Cruz stating that she does not do those things right now and that she just "does not deal with [any problems getting along with family friends, neighbors, or others." (R. 244). Even in her later Function Report (Ex. 10E), she reported that she does not spend time with others and that while she did not currently have problems getting along with family, friends, neighbors, or others, she did very little social activities in general. Her husband reiterated this information in his Function

Report stating that "she gets paranoid and feels people are out to get her" and that "she hangs out less and gets severe anxiety when in big crowds." (Ex. 6E). While the Function Reports tended to show an improvement in her physical abilities, her mental abilities appear to remain the same.

Moreover, at the hearing with the ALJ, Ms. Cruz testified that she never leaves the house unless her husband forces her to leave (R. 54), she does not drive, she is not able to function emotionally (R. 64), and that she continues to experience panic and anxiety attacks even when at home. (R. 71). Her husband also testified that Ms. Cruz was not herself – that she would be fine one minute and then all over the place the next minute and that he would find her talking to herself in the garage. (R. 82). This testimony is further corroborated by other notes in the record. While seeing Dr. Vidic at the end of 2016, he noted that she was there for memory issues and that her last bad day was five days prior to the appointment. (R. 661). In an appointment at the Oaklawn Psychiatric Center, Dr. Smucker notes that Ms. Cruz immediately started sobbing, that it took her five minutes to regroup, she stated that her anxiety had gotten worse and that she was unable to do things she liked to do out of the house. (R. 720). In the same appointment, she stated that "she has good days and bad days but has noticed that her anxieties keeping her from doing things she enjoys like driving as well as getting out and shopping." *Id*. As a result of this appointment, Ms. Cruz was started on Buspar to help with her anxiety and panicky thoughts. At the next appointment, she stated that she felt like the Buspar had helped her but that she still had good days and bad days, which prevented her from doing things she enjoyed. (R. 716). The ALJ focused on her improvement over time without mentioning the ups and downs of her experience with anxiety, depression, and paranoia. This ignores the fact that "[m]any mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of

10

waxing and waning symptoms." *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010); see also *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

Most importantly, the ALJ relies on evidence of improvement with medication without acknowledging that there was a cyclic mode of improvement for Ms. Cruz's mental health. The ALJ noted that Ms. Cruz stated improvement in July of 2017 but by October of the same year had worsened. (R. 17). At that time, Dr. Smucker stated Ms. Cruz's "[m]ood was described as up and down and affect was mood congruent and tearful at times" and prescribed her Buspar. (R. 721). This description of Ms. Cruz was used again by Dr. Smucker in December 2017 (R. 717), and Ms. Vernon, in that same month, stated that "Debra's mood remains unstable and her anxiety was recently of high severity." (R. at 713). In March of 2018, Dr. Smucker again noted that Ms. Cruz's mood was turbulent. (R. 711). These observations were all made while Ms. Cruz was taking Buspar. Yet, the ALJ concluded that her improvement on Buspar was sufficient without acknowledging the record's evidence that Ms. Cruz's mental stability vacilated over time. (R. 17). Fluctuations of mental health necessarily impact an applicant's ability to work, especially where "bad days" may render them unable to work that day. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Phillips*, 413 Fed. Appx. at 886. The RFC failed to account for these limitations despite the evidence supporting that this evidence needed to be acknowledged and considered in determining her residual capacity.

Jane Vernon, a licensed clinical social worker at Oaklawn Adult Outpatient Services, described Ms. Cruz as impulsive and noted that she would stop taking her medicine. (R. 735). Ms. Vernon also noted that Ms. Cruz did not consistently attend therapy. (R. 743). Yet, the ALJ did not address how these tendencies and lack of follow through would affect her ability to perform in the workplace. Ms. Cruz also indicated that she struggled to complete daily chores

11

and other projects. (R. 241). She also exhibited signs of paranoia and aggression towards others. (R. 253, 619). In April 2016, Ms. Cruz was described as having "angry or aggressive outbursts" and exhibited signs of paranoia by a registered nurse at Memorial Epworth Center. (R. at 383). In November 2016, Ms. Vernon stated that for Ms. Cruz to return to work "decreased paranoia" had to be achieved. (R. 619). Further, she described Ms. Cruz as "impulsive and aggressive." (*Id.*) The RFC did not account for how these tendencies, which would affect her ability to work and interact with others.

Finally, the ALJ concluded that Ms. Cruz could complete daily chores, like cleaning and watering the plants. (R. at 17). Yet, the RFC failed to consider that these tasks would take her all day and sometimes required encouragement from her spouse (R. at 241). Notably, the ALJ did not discuss how these limitations on her ability to perform would translate to a professional setting. Further, the ALJ noted that Ms. Cruz was able to go "to the store for a couple of hours as well as went out to dinner and visited family members." (R. 17). Again, the ALJ failed to consider that Ms. Cruz and her husband indicated that she would accompany him to the store but remain in the car. (R. 77). Or that her ability to visit with family is distinct from the skills necessary to interact with the public, especially because she attributed her difficulty interacting with the public to embarrassment and paranoia that others knew about her mental health episodes due to her and her husband being well known in the community. (R. 67–68, 72–73). The ALJ cited to activities Ms. Cruz stated she did in the Function Reports without noting how she no longer did many of them. Regardless, "an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time." *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010).

The ALJ's wholesale exclusion of this entire line of significant evidence supporting Ms. Cruz's claim for disability fails to demonstrate that the ALJ took into account the full extent of Ms. Cruz's mental problems and their limiting effects. *See Denton*, 596 F.3d at 425 (noting that the ALJ cannot ignore evidence that supports a disability finding). The ALJ's error in this respect requires remand because the ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," based upon all of the relevant evidence in the record, even as to limitations that are not severe. SSR 96–8p. The ALJ must then build "an accurate and logical bridge from the evidence to the conclusion" so that a court can assess the validity of the agency's decision and afford the claimant meaningful review. *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). However, the ALJ's opinion in this case does not reflect her consideration of the relevant evidence and it fails to provide a logical bridge from the actual evidence to the ALJ's RFC assessment.

## V.  CONCLUSION

For those reasons, the Court REVERSES the Commissioner's decision and REMANDS for additional proceedings consistent with this opinion. The Clerk is DIRECTED to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED:  October 23, 2020

>/s/JON E. DEGUILIO
>Chief Judge
>United States District Court